879 So.2d 1188 (2003)
Mark Raymond WELLS and Steakout
v.
Mohammad A.H. MOHAMMAD.
2010975.
Court of Civil Appeals of Alabama.
May 16, 2003.
Rehearing Denied June 27, 2003.
Certiorari Denied October 10, 2003.
*1190 R. Brian Allison of Joe C. Carroll & Associates, Birmingham, for appellants.
D. DeLeal Wininger, Jr., of The Wininger Law Firm, L.L.C., Birmingham, for appellee.
Alabama Supreme Court 1021716.
THOMPSON, Judge.[1]
On August 25, 1999, Mohammad A.H. Mohammad ("Mohammad"); Sana M. Mohammad ("Sana"); and Amin ("Amin") and Imad ("Imad") Mohammad, through their father, Mohammad, filed a complaint against Mark Raymond Wells and his employer, Steakout, seeking damages for injuries they allegedly sustained in an automobile accident involving the Mohammads' van and Wells's automobile. At the time of the accident, Wells was working delivering food for Steakout. The case was tried before a jury. The jury returned verdicts in favor of the Mohammads and awarded each of the Mohammads damages. The trial court entered a judgment on those verdicts.
The Mohammads filed a motion for a new trial, maintaining that the award of damages was inadequate as a matter of law. After conducting a hearing on that motion, the trial court entered an order denying the motion for a new trial as to Sana, Amin, and Imad, but granting it as to Mohammad. Wells and Steakout (hereinafter together referred to as "Wells") appealed.
The accident occurred on March 20, 1999. The Mohammads' van was stopped in traffic when Mark Wells's automobile struck the rear of the van. Mark Wells testified that he had been traveling at a rate of 45 miles per hour, but that he applied his brakes shortly before the impact. Mark Wells stated that he could not estimate how much his vehicle might have slowed after he applied his brakes. The parties submitted photographs of the damage to the two vehicles; those photographs depict slight damage to each of the vehicles. None of the parties requested medical treatment at the time of the accident.
Approximately three weeks after the accident, on April 7, 1999, Mohammad and Imad sought treatment from Dr. Scott *1191 Duca, a chiropractor. Shortly thereafter, Dr. Duca also began treating Sana and Amin. Dr. Duca treated the family for several months. Dr. Duca testified that the symptoms Sana, Imad, and Amin experienced either resolved themselves or became much improved. However, according to Dr. Duca, Mohammad did not progress as expected, and Dr. Duca advised Mohammad to see a medical doctor.
Mohammad first sought treatment from Dr. Hasham Hakim, a neurologist, on May 15, 1999. Dr. Hakim's deposition was read into evidence during the trial of this matter. Dr. Hakim testified that, when he first examined Mohammad, Mohammad had pain in his neck and back and that he complained of dizziness. A magnetic-resonance-imaging test, or an "MRI," performed on Mohammad in July 1999, indicated normal results except for some "partially reduced osteophytes." Dr. Hakim testified that the osteophytes "could" be caused by a trauma such as an automobile accident.
In August 1999, Mohammad was involved in another rear-end collision (hereinafter referred to as "the second accident"). In the second accident, the vehicle Mohammad was driving was struck from behind three times by another vehicle. Mohammad testified that, after the second accident, he learned that the other driver had suffered a heart attack while driving and had lost control of his vehicle. Mohammad testified that his pain was worse for several days after the second accident, but that his symptoms were the same as those he suffered after the March 20, 1999, accident. Because Dr. Hakim was on vacation, Mohammad saw a Dr. Wang, apparently a colleague of Dr. Hakim's, for treatment of his injuries after the second accident.
Dr. Hakim testified that the results of a September 2000 myelogram test on Mohammad were normal. Therefore, he opined that, with regard to Mohammad, "we are dealing with a soft tissue problem." Dr. Hakim first testified that there was no difference between MRIs performed on Mohammad in July 1999 and in January 2001; he originally testified that the July 1999 MRI showed no disk herniation, but he later testified that that MRI did show a slight herniation that was still present at the time of the January 2001 MRI.
Dr. Duca testified that Mohammad's symptoms were the same after the second accident as they had been after the March 20, 1999, accident. However, on cross-examination, he admitted that his office notes indicate that Mohammad's neck pain and headaches were worse after the second accident. Dr. Duca first stated that none of the tests performed on Mohammad revealed any positive or objective finding of an abnormality. He then testified that the X-rays did show that Mohammad had a misaligned spine. Dr. Duca testified that several factors could cause a misaligned spine, but he was not asked what those factors might be. On redirect, Dr. Duca testified that the injuries sustained by the Mohammads were consistent with those suffered by people involved in rearend collisions, "with the exception of Mr. Mohammad, who did not really progress the way I would have liked him to."
With regard to medical expenses, Dr. Duca testified that the cost of his treatment for Amin was $705; the cost for Imad was $885; and the cost for Sana was $3,614. Dr. Duca testified that that treatment was reasonable and necessary for treating their symptoms. Dr. Duca also testified that his treatment of Mohammad had been more extensive because Mohammad had not responded to treatment in the manner in which Dr. Duca had hoped. The cost of Mohammad's treatment from *1192 Dr. Duca was $4,739; Dr. Duca testified that that treatment was reasonable and necessary.
We note that Sana, Imad, and Amin each asserted claims based on their pain and suffering and mental anguish; they did not individually seek to recover the costs of their medical expenses. Rather, Mohammad sought to recover the cost of all of the Mohammads' medical expenses under the theory that he was the party financially responsible for those expenses.
Wells presented documentary evidence that Sana had signed a lien in favor of Dr. Duca on any award in her favor. Dr. Duca testified at trial that he had a lien on any award in favor of Mohammad as well.
The jury initially returned a verdict in favor of each of the Mohammads, but it awarded damages only to Mohammad. The record contains no evidence pertaining to the amount of damages the jury originally awarded Mohammad. The trial court instructed the jury that its verdicts as they related to Sana, Amin, and Imad were inconsistent, and it requested that the jury deliberate further as to the amount of damages to award to those plaintiffs. The jury ultimately returned verdicts in favor of the Mohammads, awarding Mohammad $6,595, Sana $500, and Imad and Amin $250 each. The trial court entered a judgment on those verdicts.
In its order granting the motion for a new trial as to Mohammad's claims, the trial court stated:
"The Court is mindful that the assessment of damages is essentially committed to the discretion of the jury and is presumed correct. However, a jury is not [at] liberty to ignore undisputed evidence. In this action, [the Mohammads] were occupants in an automobile that collided with [Wells's] vehicle. All of [the Mohammads] were treated by Dr. Scott Duca, who testified that the treatments were necessary because of injuries received in the accident and that his bills were reasonable and necessary. The total of his bills was Eight Thousand Three Hundred Forty Seven Dollars ($8,347). All of [the Mohammads] claimed compensatory damages for physical pain and suffering and mental anguish, and [Mohammad] claimed additional damages for medical expenses that he was caused to incur for the care and treatment of him and his family. [Wells] did not offer contradictory evidence as to the special damages, but attempted to create conflicts and weaknesses in [the Mohammads'] case through cross-examination of the witnesses, including [the Mohammads]. The testimony, however, as to the necessity and reasonableness of Dr. Duca's bill was largely uncontradicted. These bills alone were in excess of the verdict for [Mohammad] without considering any additional amount for his pain and suffering. Where liability is established, as was done ... in this case, the assessment of damages must include an amount at least as high as the uncontradicted special damages, as well as a reasonable amount as compensation for pain and suffering. If a jury's damages award is inadequate, a trial court has a duty to grant a new trial. Accordingly, the Motion for a New Trial is GRANTED as to the plaintiff [Mohammad].
"The verdicts as to the remaining Plaintiffs were based upon their claims of physical pain and suffering and mental anguish, and are within the discretion of the jury and are supported by the evidence. Accordingly, the Motion for a New Trial by ... [Sana], [Amin], and [Imad] are [DENIED]."
Wells contends that the trial court erred in granting the motion for a new *1193 trial as to Mohammad's claims. Wells contends that his cross-examination of the witnesses created factual questions and exposed weaknesses in the Mohammads' case and that, therefore, the evidence supported the jury's verdict.
Jury verdicts are presumed to be correct and will be set aside on the ground of an inadequate award of damages only where the award is so inadequate as to indicate that the jury was influenced by passion, prejudice, or improper motive. Helena Chem. Co. v. Ahern, 496 So.2d 12, 14 (Ala.1986).
"Where there is a dispute regarding the damages the plaintiff incurred as a proximate result of the defendant's wrongful conduct, the determination of a damages award is exclusively within the discretion of the jury and the jury's assessment should be afforded a strong presumption of correctness. Sizemore v. Patel, 702 So.2d 172, 174 (Ala.Civ.App. 1997); Brannon v. Webster, 562 So.2d 1337, 1339 (Ala.Civ.App.1990); Nemec v. Harris, 536 So.2d 93, 94 (Ala.Civ.App. 1988). Furthermore, in exercising its discretion, a jury has the exclusive right to weigh evidence, give credibility (or not) to witnesses, and draw inferences from the evidence before it. Brannon, 562 So.2d at 1339; Slaughter v. Burrell, 669 So.2d 954, 955 (Ala.Civ.App.1995)."
Savoy v. Watson, 852 So.2d 137, 140 (Ala. Civ.App.2002).
It is well settled that a jury is not required to award the plaintiff damages representing medical expenses merely because those medical expenses were incurred. Savoy v. Watson, supra; Sizemore v. Patel, 702 So.2d 172 (Ala.Civ.App. 1997); Bennich v. Kroger Co., 686 So.2d 1256 (Ala.Civ.App.1996); Brannon v. Webster, 562 So.2d 1337, 1339 (Ala.Civ.App. 1990). When evidence pertaining to medical expenses is admitted, the jury is free to conclude that some or all of those expenses were unnecessary, or that those expenses were not incurred as a result of the negligence of the defendant. Savoy v. Watson, supra (citing Kite v. Word, 639 So.2d 1380 (Ala.Civ.App.1994), and quoting Bennich v. Kroger Co., supra). "A jury may question the `reasonableness and necessity of expenses and determine whether the claimed medical expenses are proximately caused by the negligence of the defendant.'" Kite v. Word, 639 So.2d at 1381 (quoting Vinzant v. Hughes, 579 So.2d 681, 683 (Ala.Civ.App.1991)).
In this case, Wells cross-examined the medical experts concerning their possible biases. The testimony elicited on cross-examination served to disclose that, although he did not know the Mohammads well, Dr. Hakim attended the same mosque as the Mohammads. Wells's' cross-examination of the Mohammads' witnesses also revealed that Dr. Duca had a financial interest in the outcome of the Mohammads' action against Wells.
Wells also cross-examined the witnesses about the evidence pertaining to a second automobile accident in which Mohammad was involved. Although Mohammad testified that his symptoms were not worsened by the second accident, some of the medical records indicate that he did complain of increased pain as a result of the second accident.
Also, Wells questioned the medical experts about the necessity of the treatment for Mohammad. The testimony elicited on cross-examination indicated that the tests, such as the MRIs and the myelogram, had normal results and that, although an X-ray revealed that Mohammad had a misaligned spine, there were several possible explanations for that abnormal result. Wells also emphasized that none of the Mohammads sought medical treatment immediately following *1194 the March 20, 1999, accident and that they first sought treatment nearly three weeks after that accident.
Wells cites Stricklin v. Skipper, 545 So.2d 55 (Ala.Civ.App.1988), in which the trial court charged the jury that "`the reasonableness of and the necessity of such [medical] expenses are matters for [the jury's] determination from the evidence.'" 545 So.2d at 56. In that case, there was conflicting evidence on the issue of the proximate cause of some of the plaintiff's injuries. This court concluded that because the plaintiff in that case did not object to that jury instruction, "whether the plaintiff's medical expenses were proximately caused by the automobile accident and the negligence of the defendant was a question for the jury." Id. This court concluded: "[T]he jury was charged that the reasonableness and the necessity of the expenses were for its determination. As no objection was made to this charge, plaintiff is now precluded from arguing this on appeal." Id. at 57.
In this case, the trial court's charge to the jury included an instruction similar to the instruction at issue in Stricklin v. Skipper. With regard to the measure of damages for medical expense, the trial court charged the jury that "the reasonableness of and the necessity for such expenses are for your determination." Neither party objected to that instruction; therefore, the determination of the reasonableness and necessity of the medical expenses for the Mohammads was an issue to be resolved by the jury.
Further, the presentation of conflicting medical evidence was not required in order for the jury's determination to be deemed supported by the evidence. This court has held that "[c]onflicts and weaknesses in the plaintiff's case may also be created through cross-examination of the plaintiff's witnesses." Bennich v. Kroger Co., 686 So.2d at 1257 (citing Brannon v. Webster, 562 So.2d at 1338).
The decision whether to grant a motion for a new trial is within the discretion of the trial court; however, a trial court's order granting a motion for a new trial may be reversed where the jury's verdict is supported by the evidence and the trial court is plainly and palpably wrong in granting the new trial. Savoy v. Watson, supra.
"When reviewing a motion for new trial on the grounds of inadequate damages, the reviewing court must consider whether the verdict is so opposed to the clear and convincing weight of the evidence as to clearly fail to do substantial justice, and whether the verdict fails to give substantial compensation for substantial injuries. Orr v. Hammond, 460 So.2d 1322 (Ala.Civ.App.1984). In addition, the reviewing court must keep in mind that a jury verdict is presumed to be correct and will not be set aside for an inadequate award of damages unless the amount awarded is so inadequate as to indicate that the verdict is the result of passion, prejudice, or other improper motive. Orr v. Hammond, supra."
Helena Chem. Co. v. Ahern, 496 So.2d at 14 (emphasis added).
It is the job of the jury, and not the appellate courts, to evaluate the credibility of the witnesses. Scott v. Farnell, 775 So.2d 789 (Ala.2000). The function of the appellate courts is to determine whether the jury's verdict is supported by the evidence. Id. (citing Jawad v. Granade, 497 So.2d 471 (Ala.1986)). After reviewing the record, we conclude that Wells's cross-examination of the Mohammads and their witnesses was sufficient to call into question the reasonableness and necessity of the Mohammads' medical expenses. See *1195 Bennich v. Kroger Co., supra. A reasonable juror could have questioned whether all of the medical expenses the Mohammads claimed were reasonable and necessary and whether some of those expenses were a result of the March 20, 1999, accident. Therefore, we cannot say that the jury's verdict was "so opposed to the clear and convincing weight of the evidence" as to be clearly incorrect. Helena Chem. Co. v. Ahern, 496 So.2d at 14. In this case, as in Savoy v. Watson, supra, "the damages award is one that reasonable jurors could have made based on the particular record presented." 852 So.2d at 141. Therefore, we conclude that the trial court erred in granting the motion for a new trial as to Mohammad's claims.
REVERSED AND REMANDED.
PITTMAN and MURDOCK, JJ., concur.
YATES, P.J., and CRAWLEY, J., dissent.
CRAWLEY, Judge, dissenting.
I respectfully dissent. This court has stated:
"Granting or denial of a motion for new trial is in the trial court's discretion. The exercise of that discretion carries a presumption of correctness and will not be disturbed by this court absent plain and palpable error in exercise of the trial court's discretion and abuse of some legal right. Educators' Investment Corp. v. White, 374 So.2d 905 (Ala. Civ.App.1979). When the trial court grants a motion for new trial, without specifying the grounds, this court will presume that the lower court granted the new trial on the ground of inadequacy of damages. Smith v. Winkles, 49 Ala.App. 454, 273 So.2d 215 (Ala.Civ. App.1973).
"Defendant asserts that the jury verdict should not be disturbed as being inadequate unless the verdict was produced by passion, prejudice, improper motive or influence on the jury. Montgomery Light and Traction Co. v. King, 187 Ala. 619, 65 So. 998 (1913); Alabama Farm Bureau Mutual Casualty Insurance Co. v. Anderson, 52 Ala.App. 651, 296 So.2d 739 (Ala.Civ.App.1974). Absent evidence of improper motive, prejudice or improper influence on the juryand there is none in this casehowever, the question in the case of inadequate damages is: does the verdict fail to give substantial compensation for substantial injuries? Smith v. Winkles, supra. The trial court should only use its power to set aside a jury verdict when it is apparent that injustice will result if another jury does not examine the facts. Alabama Farm Bureau Mutual Casualty Insurance Co. v. Anderson, supra; Watts v. Pettway, 49 Ala.App. 324, 272 So.2d 251 (Ala.Civ. App.1973).
"Plaintiffs argue, as has been mentioned earlier, that the court's granting of a new trial is in its discretion and is presumed correct. Hubbard Brothers Construction Co. v. C.F. Halstead Contractor, Inc., 294 Ala. 688, 321 So.2d 169 (1975). When the trial court grants a new trial on the ground of inadequate damages, this court must indulge this presumption unless the evidence plainly and palpably supports the verdict. Curry v. Griffith, 52 Ala.App. 644, 296 So.2d 733 (Ala.Civ.App.1974)."
Cannon v. Jones, 426 So.2d 439, 440-41 (Ala.Civ.App.1983). See also Merritt v. Roberts, 481 So.2d 909 (Ala.Civ.App.1985).
The trial court's order granting a new trial specifically stated that the reasonableness and necessity of Dr. Duca's medical bills were "largely uncontradicted," and *1196 it determined the jury's verdict to be inadequate because the amount awarded to Mohammad was less than the amount of those bills. The majority opinion makes reference to facts that were not essential to the trial court's granting of a new trial or that were not specifically relied on by the defendants to support their argument that they sufficiently contradicted the reasonableness and necessity of Dr. Duca's bills. In their appeal to this court, the defendants specifically argue that they sufficiently contradicted the plaintiff's evidence of damages by questioning Dr. Duca during cross-examination about liens that had been signed by Mohammad and his wife concerning their medical bills with Dr. Duca, in response to which Dr. Duca acknowledged that he had a financial interest in the outcome of the case, and by pointing out a conflict between Dr. Duca's testimony during direct examination at trial and information in one of his medical notes.
At trial, Dr. Duca testified, during direct examination, in regard to his medical charges:
"Q. What were your total charges for Amin [Mohammad's child] during the time when you saw him?
"A. Looks like its $705.
"Q. Were those charges reasonable and necessary for [Amin's] treatment?
"A. Yes....
"....
"Q. What were Imad's [Mohammad's child] bill totals?
"A. Looks like Imad's [were] $885.
"....
"Q. Were his bills reasonable and necessary for the treatment of his symptoms?
"A. Yes they were.
"Q. Were the injuries that they sustained or the symptoms that you saw consistent with injuries that you have seen in your practice of a rear-end collision?
"A. Yes.
"....
"Q. And were the injuries that [Sana, Mohammad's wife,] sustained in this wreck consistent with those of a rearend collision?
"A. Yes.
"....
"Q. What was your total bill for treatment of Sana?
"A. Sana's was $3,614.
"Q. Were those charges reasonable and necessary for her treatment?
"A. Yes.
"....
"Q. Okay. At some point during the late summer or early fall [of 1999]
"A. Uh-huh.
"Q. is it your understanding that [Mohammad] was involved in another rear-end collision?
"A. Yes.
"Q. Tell us, Doctor, were the symptoms that he suffered after the second collision any different from the symptoms he was suffering after the collision in March of 1999?
"A. No, they were the same.
"....
"Q. Okay. How much were your total bills for Mr. Mohammad?
"A. For Mr. Mohammad, they were $4,739.
"Q. Were those bills reasonable and necessary for his treatment?
"A. Yes ...."
The total amount charged to the plaintiffs by Dr. Duca, as established by his testimony and exhibits admitted into evidence, was $9,943.
*1197 On cross-examination, Dr. Duca testified, in pertinent part:
"Q. Doctor, I think [the plaintiffs' counsel] asked you if [Mohammad's] symptoms were different after the second accident than they were before. What was your response?
"A. I believe I said they were the same.
"Q. Okay. But would you turn to your notes for August 23, 1999? Do you have your file with you?
"A. I haveyou had probably better give me what you have.
"....
"Q. Right there on top, August 23rd. That's this note right here. `Was rearended Friday August 20, pain in the neck worse, headaches worse than before.'
"That is a little bit different than what you just told the jury, is it not?
"A. Well, the symptoms were the same, and he had headaches and neck pain from the first injury.
"I don't understand what you're asking me.
"Q. Was there a difference between his pain beforehand, before August 20th and after?
"A. Yeah.
"....
"Q. Now, I also want to ask you about what I've marked as Defendant's Exhibit 4 [a lien, which was admitted into evidence but which does not appear as an exhibit to the record on appeal], and ask you is that something that you had Ms. Sana Mohammad fill out?
"A. Yes.
"Q. And did you have Mr. Mohammad fill out that, as well?
"A. I believe so.
"Q. And that document gives you a direct financial interest in this trial, does it not?
"A. Well, of course."
Keeping in mind that the trial court's grant of a new trial carries a presumption of correctness, Hubbard Brothers Construction Co. v. C.F. Halstead Contractor, Inc., 294 Ala. 688, 321 So.2d 169 (1975), I conclude that the evidence relied upon by the defendants does not contradict the necessity for, and reasonableness of, the amount of Dr. Duca's medical charges incurred by the plaintiffs and cannot be said to "plainly and palpably" support the jury's verdict. Curry v. Griffith, 52 Ala. App. 644, 296 So.2d 733 (Ala.Civ.App. 1974).
YATES, P.J., concurs.
NOTES
[1] This case was originally assigned to another judge on this court; it was reassigned to Judge Thompson on April 1, 2003.