THOMPSON, Presiding Judge.
Corey W. Tyler and Wesley Lyle Gandy were found liable in the Tuscaloosa Circuit Court (“the trial court”) for wantonness and wanton entrustment, respectively, in connection with a motor-vehicle accident in which Haylee Davis was injured. Tyler was driving the vehicle, which belonged to Gandy; Davis, who was 17 years old at the time of the accident, was a passenger in the vehicle. The jury awarded Davis’s mother, Cynthia Cardin, $9,281.90 for *259 medical expenses she incurred on behalf of Davis. Davis was awarded $100.
Cardin and Davis filed a motion for a new trial on the ground that the amount of damages awarded to each'’of them was inadequate. Tyler and Gandy moved for an additur of the judgment in favor of Cardin. The trial court granted Tyler and Gandy’s motion, and the award to Cardin was increased to $19,650.80. Cardin’s request for a new trial was then denied; however, the trial court granted Davis’s request for a new trial, stating that the damages awarded to her “were so inadequate as to indicate that the verdict [was] the result of passion, prejudice, or other improper motives such as the injection of the sexual activities of [Davis] and inapplicable defenses of contributory negligence and assumption of the risk.” Tyler and Gandy timely appealed from the order granting Davis a new trial. The appeal does not involve the judgment in favor of Cardin. -¡
Because liability is not an issue on appeal, we will primarily discuss the evidence relevant to the adequacy of damages. The record indicates that late on the night of December 10 or the early morning of December 11, 2010, Davis was injured- when the vehicle in which she was a passenger collided with a -parked vehicle and flipped (hereinafter sometimes referred to as “the first accident”). Tyler, the driver, was under the influence of alcohol at the time. Davis was riding in the backseat.
The accident happened on the street where Davis lived, near Davis’s house. Davis was able to walk to her house after the accident. She went into the laundry room, where Cardin found’her sitting on the floor crying-and trying to remove her bloodied clothes.- Emergency medibal technicians (“EMTs”) and an ambulance were' called to the scene, and Cardin moved Davis into the front yard because, Cardin said, the laundry room was cramped and there would be more room to treat-Davis in the yard.
Randy Burnett, one of the EMTs who treated Davis at the scene, testified that Davis was complaining of pain in her neck and left shoulder, as well as of pain in her chest, back, and legs. He said that he initially noted in his written report that Davis was having pain in her right shoulder but that that was a mistake that he corrected in the assessment portion of the report.
Davis was transported by ambulance to Druid City Hospital (“DCH”) in Tuscaloosa. -Dr. Ahmed Moussa treated Davis in DCH’s emergency room. Dr. Moussa testified that DCH had received a . call from the ambulance regarding Davis’s injuries and were prepared for her when she reached the hospital. The call from the ambulance is based on the EMT report, Dr. Moussa said, so emergency-room personnel initially believed -that Davis was complaining of pain in her right shoulder. However, he said,-his own examination of Davis • indicated that Davis actually had pain in her left shoulder, chest, legs, abdomen, and back. A series of diagnostic tests were run on Davis, including a CT scan and an MRI, and Dr. Moussa determined that Davis had no fractures. Davis testified that she was* .unable to raise her left arm during-the diagnostic tests;, however, Kim Lancaster, a radiology technologist at DCH, testified that the CT scan that was taken the night of the accident shows Davis’s right arm at rest and her left arm lifted above her head.
Davis also had a cut under her chin. Dr. Moussa stitched'the cut under her chin and provided her with pain medication and muscle relaxers. ' Dr. Moussa then advised Davis to see her own physician and released her, and Davis returnéd home.
*260 Cardin and Davis- testified that Davis was sore in the days after the accident. About one week after the accident, Davis returned to DCH to have her stitches removed. Davis testified that she was still having pain in her right kneé and left shoulder. However, she said that she did not advise the doctor of her knee and shoulder pain on that follow-up visit because, she said, that was not the reason she was at the hospital. Gandy testified that he visited with Davis often in the days following the accident. He said that Davis did not complain of pain or of popping in her left shoulder. In fact, he said, Davis slept on her left side. Davis also made no complaints to Gandy of her right knee “locking up” or that it was hurting. Gam dy said that Davis did not walk with a limp when he visited her.
Ten days after the accident, Davis was involved in another accident that required a visit to the DCH emergency room. In the December 20, 2010, accident (“the second accident”), Davis drove Cardin’s van without permission. Davis, who had not obtained a driver’s license, collided with another vehicle.- Davis “T-boned” the other vehicle,- and she acknowledged that she was at fault. Cardin testified that the van “was not driveable” after the wreck. Davis said that she ran from the scene because she was afraid she would go to jail because she did not have a driver’s license. Davis was again taken to DCH for treatment because the -cut on her chin had reopened and her chest hurt from being struck by the air bag when it deployed. Davis denied that her left shoulder or right knee was injured in the second accident.
Davis did not have insurance or her own doctor. If she needed medical treatment, she said, she went to the emergency room. Davis testified that .she visited the emergency room on several occasions during 2011 for conditions like colds, fever, and migraine headaches. Although she was still having right-knee- and left-shoulder pain, Davis said, she did not mention that pain to doctors on any of her subsequent emergency-room visits. She said that she did not complain of knee or shoulder pain because, she said, there was “nothing that could have been done about it. I had no health insurance.”
Davis moved to Mississippi and married. On April 17, 2012, Davis was a passenger in a. truck her husband was driving. Davis testified that they were traveling at about 50 miles an hour when the truck hydroplaned and hit a tree (“the third accident”). Davis’s husband was not wearing, a seat-belt, and he was thrown from the truck, breaking his back. Davis was wearing a seatbelt, and her injuries were less severe than her husband’s. -Medical records.from the hospital where she was treated on April 17, 2012, indicate that Davis complained of pain in her right shoulder, hip, and knee. The “clinical impression” portion of the record indicates that Davis suffered contusions on her back, right shoulder, and right knee.
Davis testified that, after the third accident, she had no problems with her right knee, and left shoulder that-she was not already having. Davis said that her left shoulder and right knee had hurt since the first accident.. Cardin said that, after the first accident, Davis’s right knee would “lock up” at times.
Testimony was elicited from Davis and Cardin indicating that, in 2008, Davis had an accident on a “mini-bike” in which she suffered what Davis characterized as “minor injuries.” Davis testified that she was thrown oyer the bike’s handlebars and that she injured “this shoulder,” but we cannot discern from the. record whether “this shoulder” was her right or left one. Davis said that she had no physical problems as a result of the mini-bike accident.
*261 On August 9, 2012, Davis saw Dr. William Bose, an orthopedic surgeon in Mobile. Davis said that she, was sent to Dr. Bose by her. attorney, who practices in Mobile. In his deposition, which was read into the record at trial, Dr. Bose testified that Davis’s attorney told him that Davis had been in a car wreck and that her knee and shoulder kept hurting her and asked whether Dr. Bose could see her. Dr. Bose said that Davis told him that she had had no problems with her left shoulder or right knee before the first accident. Dr. Bose said that he. treated Davis based on the information she provided to him and acknowledged that he did not know of the mini-bike accident or the second accident at the time he treated Davis. He said that he believed that Davis did tell him about the third accident.
Dr. Bose said that Davis complained of pain in her right knee and instability and locking in that knee. She also complained, he said, of a painful “popping” in her left shoulder. Dr. Bose diagnosed Davis with a medial meniscus tear in her right knee and with a slight labral tear in her left shoulder. Both injuries are consistent with trauma sustained in a motor-vehicle accident, Dr. Bose testified, although, he said, there are several possible causes for both injuries. He stated that he found that Davis had chondromalacia patellae, which is a roughening of the cartilage' on the outside of the knee. Dr. Bose testified that that condition “classically” can be caused by “blunt force to the front of the knee, which is the knee hitting a dashboard or falling on your knee.” ' Generally, Dr. Bose said, a meniscus tear is a “twisting injury,” but it can occur in a motor-vehicle accident. A torn labrum is an injury that is often caused by a throwing action, but it also can occur as a result of a motor-vehicle accident, Dr. Bose said. Dr. Bose performed what he said were successful surgeries on Davis’s left shoulder and right knee. Davis also had physical therapy on both her injured knee and shoulder.
As mentioned, the jury returned a verdict in favor of Dávis and Cardin. It awarded $100 to Davis and $9,281.90 to Cardin, who was responsible for the bills incurred as a result of Davis’s treatment at DCH resulting from the first accident. The trial court agreed with Davis that the amount the jury awarded' to her, which obviously did not include the cost of the surgeries Dr. Bose had performed on her right knee and left shoulder and the related physical therapy, was inadequate and ordered a new trial.
On appeal, Tyler and Gandy. contend that the trial court erred in granting Davis’s request for a new trial because, they argue, the jury’s award of $3,00 in damages to Davis was not. inadequate and, instead, was supported by the evidence.
In granting Davis’s motion for a new trial, the trial court determined that the damages awarded to Davis “were so inadequate as to indicate that the verdict-[was] the result of passion, prejudice, or other improper motives such as the injection of the sexual activities of [Davis] and inapplicable defenses of contributory negligence and assumption of the risk.”
The record indicates-that, while making her opening statement to the jury, an attorney for Tyler and Gandy said that she expected Gandy to testify that, at the time of the first accident, he and Davis were in the backseat of the vehicle having sex. Davis’s attorney immediately objected and requested a mistrial. The trial court denied the motion for a mistrial but repeated to the attorneys its previous ruling that evidence of sexual history was not to be broached and that the court would enter sanctions if the subject was raised again. In their briefs, the parties do not contend *262 that the issue was raised within the jury’s hearing during testimony. Our review of the record indicates that, during Gandy’s testimony, sexual activity was referred to obliquely during questioning by Davis’s own attorney.[1]
As to the trial court’s statement that the damages award was inadequate based on the “injection” of the “inapplicable defenses of contributory negligence and assumption of the risk,” that topic appears to have arisen during defense counsel’s statement during closing argument that Davis “made bad decisions” the night of the first accident and that “she chose to get in the car with someone she knew had been drinking.” The trial court immediately called counsel to the bench and pointed out that it had ruled that contributory negligence and assumption of the risk were" not defenses in this case. Davis’s counsel then objected to the statement. The trial court- directed defense counsel to advise the jury that Tyler and Gandy were not offering “any defense based upon [Davis’s] being intoxicated.” The trial court admonished defense counsel that “[i]f you fix it, then I will not say anything.' If you don’t fix- it, then I will.” Defense counsel then said:
“Ladies and gentlemen, we are hot arguing .here that contributory negligence is a defense in this case because .it ■is not. This case is about wantonness. And I apologize if my prior statement indicated that. We are not making that argument here.”
The trial court did not charge the jury on the affirmative defenses of contributory negligence or assumption of the risk.
“ ‘ “When reviewing a motion for new trial on the grounds of inadequate damages, the reviewing court must consider whether the verdict is so opposed to the dear and convincing weight of the evidence as to clearly fail to do substantial justice, and whether the verdict fails to give substantial compensation for substantial injuries. Orr v. Hammond, 460 So.2d 1322 (Ala.Civ.App.1984). In addition, the reviewing court must keep in mind that a jury verdict is presumed to be correct and will not be set aside for an inadequate award of damages unless the amount awarded is so inadequate as to indicate that the verdict is the result of passion, prejudice,'or other improper motive. Orr v. Hammond, supra.” ’
“Wells [v. Mohammad ], 879 So.2d 1188, 1194 (Ala.Civ.App.2003) (quoting Helena Chem. Co. v. Ahern, 496 So.2d 12, 14 (Ala.1986)).”
412 S. Court St., LLC v. Alabama Psychiatric Servs., P.C., 163 So.3d 1020, 1029 (Ala.Civ.App.2014).
The evidence was undisputed that Davis was . involved in two serious accidents after the first accident and that she was in the backseat of the car at the time *263 of the first accident. In the second accident — the accident of December 20,2010— Davis was driving Cardin’s van when she “T-boned” another vehicle, meaning that the front of the van hit the other vehicle broadside. In the third accident, Davis was a passenger in the front seat of the truck her husband, was driving when the truck collided with a tree at approximately 50 miles an hour. After both the second and third accidents, Davis was treated in hospital emergency rooms. Dr. Bose testified that the type of knee injury Davis had could occur from “hitting a dashboard or falling on your knee.” The jury could have determined that it was more likely that Davis injured her right knee by hitting it on a dashboard in either of the later accidents than by hitting something softer, such as the back of the seat in front of her, in the first accident.
Additionally,
“[i]t is well established that any credibility determination was solely the province of the jury. See, e.g., Tucker v. State, 650 So.2d 534, 535 (Ala.Crim.App.1994) (‘ “The weight and probative value to be given to the evidence, the credibility of the witnesses and the resolution of conflicting testimony are for the jury’s determination.” ’ (quoting Brown v. State, 588 So.2d 551, 559 (Ala.Crim.App.1991))).”
Pensacola Motor Sales, Inc. v. Daphne Auto., LLC, 155 So.3d 930, 947 n. 9 (Ala.2013).
Evidence indicated that Davis admitted that, after the first accident, she did not mention knee or shoulder pain during her follow-up visit to the DCH emergency room, when she had her stitches removed. She also did not mention that she was ‘having knee or shoulder pain on her numerous visits to hospital emergency rooms during 2011, because, she said, she did not have insurance. Because Davis obviously sought emergency-room treatment for reasons other than knee or shoulder pain even though she did not have insurance, the jury could have disbelieved the reason she gave for not mentioning her knee or shoulder pain. Additionally, Gandy testified that when he visited Davis in the days immediately after the first accident, she did not complain of any problems with her right knee or her left shoulder and, in fact, was sleeping on her left side. A reasonable inference could be drawn that Davis was not experiencing right-knee and left-shoulder pain after the first accident and that it was not until after the third accident that she sustained the injuries to her right knee and left shoulder.
We conclude that the evidence presented and the inferences to be drawn from that evidence sufficiently substantiated the jury’s determination that Davis did not meet her burden of showing that the injuries to her right knee and left shoulder were sustained in the first accident. The jury could have determined that the only injuries Davis suffered in the first accident were the cut to her chin and bumps and bruises. Moreover, there was no testimony regarding any pain or problems Davis had as a result of that cut. We cannot say that the award to Davis was so inadequate as to indicate that the jury’s verdict was influenced by the mention of sexual activity (which, we note,.was touched on during testimony elicited not by Tyler and Gan-dy’s attorney but by Davis’s attorney) or by any suggestion that Davis might have been contributorily negligent or had assumed the risk.
In response to Tyler and Gandy’s argument, Davis asserts that the trial court properly grafted her motion for a new trial because, she says, the $100 the jury awarded to her was insufficient. In support of her assertion, Davis states that “Alabama law is well settled that ... dam *264 ages for pain and suffering should have been at least the amount of undisputed medical expenses.” Our research has revealed no cases standing for such a proposition, however. The authority Davis relies on. provides that, when a “plaintiff claims a personal injury and seeks- damages for pain and suffering, the verdict must include 'an amount at least as high as the uncontradicted special damages, plus an amount sufficient to compensate for pain and suffering.” Grimes v. Dodge, 816 So.2d 53, 54 (Ala.Civ.App.2001); Nemec v. Harris, 536 So.2d 93, 94 (Ala.Civ.App.1988) (same). She also points out that when a plaintiff is awarded the exact amount of medical bills, without more, the verdict is inadequate because there is no compensation for pain and suffering. Kinard v. Davis, 594 So.2d 157, 159 (Ala.Civ.App.1992); see also Ex parte Courtney, 937 So.2d 1060, 1062 (Ala.2006) (“ ‘[Wjhere liability is established, the jury’s assessment of damages must include, at the least, an amount sufficient to compensate the plaintiff for his or her uncontradicted special .damages, as w¡ell as a reasonable amount of compensation for pain and suffering.’” (quoting Smith v. Darring, 659 So.2d 678, 679-80 (Ala.Civ.App.1995) (emphasis omitted))).
Here, Cardin was' responsible for paying the medical bills for the treatment Davis received at DCH the night of the first accident. Tyler and Gandy sought an additur of the amount of the jury’s verdict in favor of Cardin to cover the amount of those bills, and Cardin is not a party to this appeal. The jury then awarded Davis an additional $100, presumably for the pain ándv suffering she sustained in the first accident. As discussed, the jury reasonably could have found that Davis did not injure her right knee and left shoulder in that accident- and was entitled to damages only for the cut to her chin and the soreness she had in the days immediately after the accident. Davis -made no argument that the $100 award was inadequate for those injuries. Because we presume that the jury’s verdict is correct and because we find that the $100 awarded to Davis' is supported by the evidence and is not so inadequate as to indicate that the verdict is the result of passion, prejudice, or some other improper'motive, the trial court’s order granting Davis a new trial must be reversed.
Because we are reversing the trial court’s order for a new trial, we pretermit discussion of whether the trial court erred in prohibiting Tyler and Gandy from offering evidence of contributory negligence and assumption of the risk and the trial court’s refusal to charge the jury on those defenses. For the reasons set forth above; the order of the trial court granting Davis a new trial is reversed. This cause is remanded to the trial court for it to vacate that order and to reinstate the judgment based on the jury’s verdict.
REVERSED AND REMANDED.
PITTMAN, THOMAS, and MOORE, JJ., concur.
DONALDSON, J., dissents, with writing.

. On redirect examination by Davis’s attorney, the following discussion was held:
"Q.: [By Davis’s attorney]: In your deposition you said you were too busy to see how fast it was, you were too busy screaming for [Tyler] to stop.
"A.:, [Gandy]: Well, you know, I was kind of busy at the time. And you have got to focus on" who is in front of you.
“Q.: I have got you. You were so scared that even when you’re doing what you say you were doing — everybody in this jury knows you weren’t — you still were scared enough to stop that activity and say stop? It got your attention that much, didn't it?
“A.: That didn’t stop until the collision.
"Q,: You were so scared that you stopped whatever you are up here re-recollecting about that we all know didn't happen to say stop, right?
“A.: I—
"Q.: I will withdraw the question.’’